Haynes, J.
This case was heard at the last term of the circuit court iu Williams county, and was brought here to Toledo for consultation and final decision. . The case, which was submitted to Judge Scribner and myself, is an anomaly, one like it we are unable to find in any of the reports of the state. The decision of the case must ultimately rest upon the discussion of general principles, and, of course, the rule of law in that class of cases in the state of Ohio, must be decided finally by the Supreme Court of the state, to which it will undoubtedly go, and to which it ought to go.
It appears that the case has been before us for the third time. The first time the case was brought, the judgment was reversed on error of the court in its charge. The second time it was heard, it was decided on the facts of the case, and was then taken to the Supreme Court, ivhere it ivas pending some *231 three or four years and a vas then affirmed ; but on the particular question which does not bear upon the merits of the case here, was sent back for trial, and has been retried. Some additional testimony has been offered, and the case is now submitted to this court for its decision.
The testimony very briefly shows that on the 27th of April, 1887, the plaintiff was a member of the Odd Fellows’ lodge in Bryan, Ohio, and in company with other members of that lodge, came to the city of Toledo for the purpose of assisting in dedicating a new temple of the order-there in that city. An arrangement was made with the Lake Shore Railroad by that organization, whereby they were brought here, and were to be taken home on a late train in the evening after the conclusion of the exercises here. The company, in pursuance of that arrangement, made up a special train consisting of two -or three passenger coaches and locomotive, and to that train, at the rear end of it, attached a caboose for the accommodation of the crew in charge of the train, with no intention of carrying any passengers in it, because it was put on for the accommodation of the trainmen. That caboose was lower than the passenger car, and in the adjustment of connections, there was quite a little space between the passenger car and the caboose — a down-step of quite a considerable distance, perhaps of eight or ten inches, or more. The train, having received its passengers, went on its way, and after it had passed out of the city some ten miles, one Shawley, a member of the organization and a passenger on the train, and who was afflicted Avith a rupture in the lower part of his body, Avas taken ill with that; it had become displaced in some Avay, and AA’as causing him intense suffering. He finally made his condition knoAAm to some of his associates, and a physician who was on the train — an acquaintance and friend, and perhaps a member of the order also, Avas called in, and found, upon examination, that there had got to be a replacement of the deranged organs, and that, in order to do it, it would be necessary to lower and perhaps to remove the pantaloons of the party, and further, *232 he would have to put the patient where he could lie down. The coach in which the man was, was .filled' with members of the order, both men and women — quite a large number of women being present in the car. They deemed it impractical to perform the operation there, because of the presence of ladies, and the fact that this party had got to be partially disrobed. They looked about to see if another place could be obtained, and thereupon, as it is claimed, they laid the matter before the conductor of the train. The conductor, learning the condition of affairs, told them that there was attached to the train this caboose. In it were seats lengthwise of the car, and those could be utilized, and that when they came to .the next station, which would beSwanton, in this county, the passenger could be removed. The testimony differs somewhat in regard to what took place from that time forward, there being as shown on such occasion, a difference of statement in regard to the condition of affairs. It was claimed by the plaintiff, and testimony was offered tending to show, that the conductor remained there, and that when the party was about to be removed, he requested plaintiff, who constituted one of the party, to assist in removing him to the other car; and that in pursuance of that request, Saltzman did take hold of Shawley, and was one of the four persons who helped to carry and place him in the next car. So far as that question was concerned, it was denied by the conductor.
As the car was stopping, it is claimed they commenced to remove Shawley, and as the car came to a stop, the door was opened, and the parties proceeded towards the next car. As they came to the door of the passenger car, it was not of sufficient width to admit the two who had hold of the head, to go abreast, and thereupon Saltzman immediately stepped behind, — a little more behind Shawley, and put his arms more under his back and shoulders, and was, as he claims, supporting him both by his hands, and by the pressure of his knee. The other parties with him followed to the door, and took *233 hold of bis shoulders again, as he got near the crossing. The plaintiff claims then, that as he got up to the crossing, having no knowledge of the fall that there was in the step — he was pushing his feet along and carrying the party — and just at the time that he got to the edge of the platform, he heard some one call in regard to the step, but that the call came to him at the same time he was making the step; and that they were coincident. As he heard the call, his feet went down off the platform, and he stepped down the whole length of his limb between the cars, and he was in fact seriously injured by that step and the fall following it. It is claimed that the conductor, at the time he had invited Saltzman to assist, did not inform him in regard to this platform, and that the only steps that were taken by him to protect the parties in carrying Shawley from one car to the other, was in giving directions to the rear brakeman; that the rear brakeman should proceed outside the car and attempt to assist in regard to the matter. That the rear brakeman did pass out of the car, and did attempt to assist at the time, there is no question; but whether the conductor still remained there or not, is' the question in dispute, the testimony of the conductor being that he notified the brakeman to attend to the matter and give assistance; that the moment the car stopped, he went out and went to the telegraph office, in pursuance of his regular duties, to receive telegrams or orders, if any there should be for him at that point, and he remained there until after the accident.
The brakeman’s testimony is that he got out and got down on the sidewalk, and held a light. It is claimed that he gave notice in regard to the step, and made the call. It appears from the testimony of witnesses, that one or two members of the party had got into the caboose soon after it started ; that there was a single light in the caboose. The plaintiff offered testimony tending to show that the space between the cars was not lighted ; it was dark ; that whatever light there may have been was shining perhaps, under the car; that *234 there was no light in the caboose that would reflect or throw light out on the platform so that parties approaching could see in between those two cars.
Now, with this general statement, simply" to illustrate the character of the case, the case, as I have said, was tried to a jury and submitted upon the charge of the court, which seems to have been carefully prepared, and seems to present very fully the points that are in issue between the parties on the question of law, the contention of the plaintiff being that Saltzman was requested by the conductor to assist in taking Shawley back into the caboose ; that, as a result of that, he owed to Saltzman the duty of seeing that he was protected and guarded and looked after, and notified of any dangers that might arise in the performance of the act. That the court practically charged to the jury.
It was contended by the railroad company that this caboose was attached to the train simply for the convenience of the trainmen; that there was no intention of placing any passengers in it; that if this person was taken sick upon the train, and it became necessary" to remove him to this caboose for the purpose of enabling the physician to perform his duty toward him, that the railway company incurred no legal responsibility in regard to the matter — it was charged with no duty. It is claimed by them that Saltzman did volunteer to assist in taking Shawley back into the caboose, and that if any accident happened to him in the performance of that act, that it was simply an accident for which the company was not responsible.
We have given this matter a good deal of attention and a good deal of discussion. As I have already stated,' the questions are novel. There are very few authorities upon them. A large body of authorities perhaps seems to' bear upon this question regarding the general duty of the railroad company toward passengers who are put or taken off trains for reasons which may be justifiable, and yet under circumstances where a party, being *235 sick or otherwise, has need of care and attention for injuries. The decisions so far as they bear upon this question, are short of reaching this case, and may be said to be-very contradictory, and they leave the court in a position of doubt and uncertainty in regard to what the law should be declared to be, or held to be.
Reasoning now from principle, it would seem that if a passenger is received on board of a train, and becomes sick after he gets upon the train, so that he needs care and attention,, that it is, and should be a part of the duty of the railway company and its servants on board the train, so far as may be consistent with the safe management of the train and proper care-for the safety of the other passengers upon the train, to afford such aid and assistance as they reasonably can, to the passenger who is thus stricken or afflicted.
It would seem that if a passenger became sick in the condition that Shawley was, and there was a place upon the train where he could be taken and placed so he would be comfortable, so that a surgeon could properly perform his duty towards him, that it was the duty of the railway company to afford all facilities and aid in enabling the passenger to reach that place, and be placed where he could be taken care of, consistent at all times, of course, with the duties the officers of' the train owe to the general care of the train. Still, in the examination of authorities, we find that there is a broad difference of opinion in regard to the class of cases of which I speak.
In vol. 2, of American and English Encyclopedia of Law,, at page 767, is this language:
“Infirm Passengers. — Where a railway company voluntarily accepts, as a passenger, one whose physical disability is apparent, or is made known to its servants, and rendering special assistance necessary, the railway is negligent if said assistance is not afforded.”
They refer to quite a number of authorities, all of which we have examined, with many more that we have had before us. I will read one of the authorities they cite in support of that, *236 proposition. It is the case of the New Orleans, Jaelcson & Great Northern Railroad Company v. John B. Statham, a decision of the High Court of Appeals in the state of Mississippi, volume 42, page 607, decided in 1866. Mr. Statham was a passenger on the train, and, as plaintiff below, claimed to have been a person who was unable to walk and requii-ed assistance ; that he got aboard of the train, and when they got to the station where he wanted to get off, the conductor only gave a short time to get off; that before he could get off, the conductor started up the train, and got perhaps one hundred and fifty yards or more — quite a distance beyond the station, when his attention was called to the condition of the passenger; but he refused to back up, and used some strong language in regard thereto ; that thereupon the friends of the plaintiff below took him off the train, and got him into a carriage and to a hotel, and that he was injured in cousequen'ce, etc.
The trial court below so charged the jury that a verdict was returned for the plaintiff below, and the case came on for hearing in the ,court of errors. It is a very lengthy decision, and I shall not attempt to quote all of it. After discussing the facts in the case, and some propositions of law that were given by the court below, and after having decided to reverse the case, the court further stated some propositions for the guidance of the court which was to try the case again, the presiding justice saying:
“ Railroad cars are not traveling hospitals, nor their employes nurses. Sick persons have a right to enter the cars of a railroad company; as common carriers of passengers they cannot prevent their entering their cars.
“If they are unable to take care of themselves, they should have attendants along to care for them, or to render them such assistance as they may require in the cars and to assist them from the cars at the point of their destination. It is not the duty of conductors to see to the debarkation of passengers. They should have stations announced; they should stop the train sufficiently long for passengers for each station to get off. *237 "When this is done, their duty to the passengers is performed. All assistance that a conductor may extend to iadies without escorts, or with children, or to persons who are sick and ask assistance in getting on and off trains, is purely a matter of courtesy, and not at all incumbent upon him in the line of his public duty.”
That touches the question of passengers getting on and off trains. There is quite a body of these decisions. It will be found, on reading them, that they vary. 'In 1889, the Supreme Court of Louisiana decided a ease which may be found in volume 41, of the Louisiana Annual Reports, at page 57. In that case a gentleman, apparently a prosperous man, and a well-behaved gentleman, got upon the street car, paid his fare, took his seat and rode several blocks, when he suddenly commenced to vomit. Some objection being made by the passengers, he was able to say he would try and get off; but when he rose to get off, he fell his whole length, and thereupon the conductor took hold of him and got him off the car, and laid liim down in the street between the car track and the curbstone, upon a cold, drizzly day, in the month of December. Having done this, he mounted bis car and proceeded on his way. "He passed there two or three times during the afternoon and saw this party lying there, but said no more. The party, after he got onto the street, was struggling some, and in doing so, threw his feet over the rail. Some lady coming along and seeing his condition, requested a gentleman to help him, which he did. He was straightened out, but still remained in that position. Subsequently, the matter having come to the attention of the police, he was removed, and died in the hospital the next morning.
The passengers very charitably jumped to the conclusion, when he commenced to vomit, that he had been drinking. The conductor of the street car thought he discerned that fact also, and stated that he was drunk. The truth was, he was a sober man, and had been stricken with appoplexy, and as a result of that, did what is very common in that disease— *238 commenced to vomit. The case was tried in the court below, and a verdict was returned for the plaintiff below, who was a widow, and who sued as administratrix. ' The Supreme Court affirmed that decision, stating the duty of a street railway company in regard to a passenger taken off. I will read the syllabus in the case : “ Although a common carrier of passengers owes obligations to its well passengers as well as io those who are sick, and is bound -to protect the rights of both ; and although when the condition of passengers from sickness or otherwise is such as to be inconsistent with the safety, health, or even comfort of his fellow passengers, regard for the rights of the latter will authorize the carrier to terminate the carriage by excluding him; yet this right cannot be exercised arbitrarily or inhumanely, or without due care and provision for the safety and well being of the ejected passenger.” The court say : “We therefore conclude that the conduct of the defendant’s agent in turning out this helpless and speechless sick passenger into the roadway of the street, and there leaving him on an inclement day without the slightest attempt at the moment, or afterwards, to have him taken care of, was a gross violation of its duty.”
I have read these cases for the purpose of showing the views of the courts and of showing something of the general course, or the general thought of the decisions upon them. We shall not attempt in this case to lay down any general rule in regard to this matter. It is sufficient in this case to say as we do, that there is doubt as to what the true rule of law should be. There are no authorities of our own state that we know of, governing the case. It is a case that will never be decided until it is finally decided by the Supreme Court of the state. The principles are such that they should be decided by the Supreme Court of the state. The record is in a condition where the questions or principles in dispute can be fairly and properly brought before that court, and we think,that under those circumstances, this court ought not to interfere *239 to reverse the judgment for alleged errors in the charge of the court, but to allow the case to go to the Supreme Court; for, if the rules of law that are laid down by the court of common pleas in its charge given to the jury, are correct and are the law of the state of Ohio, then we are of the opinion that this court would not be justified, on the facts of the case as they appear in this record, in interfering to disturb the verdict on the ground that the verdict was against the evidence. And with this statement, that I have given simply for the purpose of showing the reason why we have sent the case to the Supreme Court, the judgment of the court of common pleas will be affirmed.
Potter & Bowersox, for plaintiff in error.
Masters & Hurd, for defendant in error.